IN THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| SARAH CARROLL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 7:15-cv-00497 |
| SALON DEL SOL, INC., | ) |
| | ) |
| Defendant. | ) |

<u>MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT</u>

     Defendant Salon Del Sol, Inc. ("Salon Del Sol") has filed herein a motion for summary judgment and supporting memorandum [ECF 28, 29].  Material questions of fact preclude summary judgment.  The motion is therefore without merit and must be denied.

## **<u>FACTS</u>**

     Salon Del Sol is a beauty salon and day spa with 5 locations — 4 in the Richmond area, 1 in Roanoke (Exhibit 18, Vetsch Dep., at 7-8).  Sarah Carroll was hired as a senior stylist in the Roanoke shop in fall 2011 (Exhibit 1, Carroll Dep., at 7-8).  Her employment was uneventful until Shawn Spencer was hired as the manager for the salon in early 2013 (Exhibit 2).  Spencer was a volatile manager who made offensive racial comments to her subordinates (Ex. 1, at 41-43).  For instance, Spencer told Carroll that she did not hire a black female for the front desk "because of her long fingernails and feather earrings would scare the white people" (<u>Id.</u> at 46).  Carroll, of course, found this to be very offensive (<u>Id.</u>).  Spencer also stated that she did not understand "the whole white-girl-dating-black-guy thing" (<u>Id.</u> at 47).  While in Spencer's view it was acceptable

1

for a white male to date a black female, she did not understand why a white female would date a black male.  And, notably, Carroll has been in a long-term relationship with an African-American male for the past six years (Exhibit 3, Hall Dep., at 5-6).  When Spencer questioned Carroll concerning her relationship with an African-American, Carroll responded in a nice way providing her view that white women should be able to date whomever they want, including black men (Ex. 1, at 56).  As Carroll stated, "I feel like it's important to educate people about things like that, especially racism" (Id. at 57). Spencer also commented that black men like white women due to their curves (Id. at 74). Spencer made other comments about white women dating black men, as well (Id. at 47). For example, Spencer had a very "intimidating" conversation with another co-worker, Kari Bagby, about her interracial relationship with an African-American male (Id. at 75-76).

Other employees were also offended by Spencer's comments.  For example, Whitney Wohlford, a stylist for Salon Del Sol, witnessed Spencer "make comments disapproving of white women dating black men and other similar comments" (Exhibit 4, Wohlford declaration).  And, Wohlford also witnessed Spencer refusing to hire an African-American woman because she felt she looked "ghetto" (Id.).  Lauren Sacra, another stylist, also witnessed offensive racial comments by Spencer (Exhibit 5, Sacra declaration).

Fed up with Spencer's inability to manage and disgusted with the comments and the increasingly hostile work environment, on June 12, 2013 Carroll reported her concerns to Spencer and to the owner of the company, Denise Vetsch (Ex. 1, at 33), in an email (Exhibit 6).  With respect to the racial issues, Carroll stated to Spencer, which was

copied to Vetsch, that "I can not hear one more racial comment come out of your mouth. The comments you make about white women dating black men is disgusting.  My child is bi-racial so I take serious offense to that.  The night you and I had the conversation about it, I was slightly offended but you didn't approach me as aggressively and disrespectfully as you did another employee. When I heard that you continued with this issue, I was appalled.  But the comments didn't stop there.  You have made comments about how we 'white girls are curvy and made for black men'.  Its very disturbing that my manager turns everything racial.   Also, I sent you an amazing front desk prospect and your comment was that you didn't want to 'scare the white people' because of her finger nails and earrings.  That's absolutely absurd."   Four days later, instead of addressing Carroll's concerns, Vetsch consulted with the harasser then sent an email to Carroll, copied to Spencer, stating that Carroll was "severely disgruntled and unhappy with [her] employment with SDS" and terminating her employment (Exhibit 7; *see also* Ex. 18, at 33).   Not surprisingly, no investigation was ever performed to determine what racial comments had been made by Spencer, and no disciplinary action was ever taken to address the issue (Ex. 4; Ex. 5; Exhibit 8, Byles Dep., at 27-28; Ex. 18, at 41; Exhibit 19, Storer Dep., at 25-26, 35).   And, despite the racial comments, Vetsch maintains that Spencer was an "[e]xcellent" employee (Ex. 18, at 31).

Further detailing of facts is reserved for argument.[1]

---

[1] Defendant has set forth their facts in numbered paragraphs.  As set forth herein, plaintiff disagrees that many of the numbered paragraphs are "undisputed" as suggested by defendant. For example, plaintiff disputes paragraphs 14, 17, 28, 30, 31, 33, 35, 37, 38, 39, 40, 45 (incomplete, Carroll offered other meeting dates that she was available), 46, 47, 48, 49, 50, and 51.

## STANDARD OF REVIEW

Employing familiar standards, the Court will view the evidence in the light most favorable to plaintiff to determine whether material questions of fact exist.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  Reeves v. Sanders Plumbing Products, Inc., 530 U.S. 133, 151 (2000) (citation omitted); *see also* Tolan v. Cotton, 134 S. Ct. 1861, 1867-68, 188 L. Ed. 2d 895, 902 (reversing summary judgment where "the court below credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion").

## ARGUMENT AND AUTHORITIES

The evidence demonstrates, in short, that at a bare minimum a question of fact exists as to whether Carroll was subjected to a racially hostile work environment and whether she was terminated for complaining about it.[2]  Therefore, summary judgment must be denied.

### A.  Hostile Work Environment

As the Fourth has observed, a plaintiff makes out a *prima facie* case on a hostile work environment claim if there is a question of fact as to the following factors:

> [the plaintiff] suffered workplace harassment that was "(1) unwelcome, (2) based on race, (3) sufficiently severe and pervasive to alter the conditions of employment and create an abusive atmosphere[,]" Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir.2001)[, and (4)] "there is some basis for imposing liability" on [the employer]

---

[2] Plaintiff is not alleging that she was terminated on the basis of her race as defendant suggests [ECF 29, at 11-14], and therefore plaintiff will not respond to defendant's arguments with respect to that claim.

White v. BFI Waste Services, LLC, 375 F.3d 288, 296-97 (4th Cir. 2004).  Salon Del Sol has argued only that Carroll has failed to meet the severe or pervasive prong [ECF 18, at 14-18].  Therefore Carroll will address only that element here.[3]

As an initial matter, Salon Del Sol's reliance on Jordan v. Alternative Res. Corp., 458 F.3d 332 (4th Cir. 2006) [ECF 29 at 15] is misplaced.  Jordan was expressly overruled by Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 268-69 (4th Cir. 2015) ("Jordan is hereby overruled").  As the Fourth Circuit held in Boyer-Liberto, one comment alone, if serious enough, may be sufficient to create a question of fact as to whether there was a hostile work environment.  Thus, the repeated comments by Carroll's supervisor Spencer here — as Carroll put it, Spencer turning "everything racial" — which spanned only a few months and therefore are more pervasive than may appear at first blush, are sufficient for a jury to determine whether Carroll was subjected to a severe or pervasive hostile work environment.  The Fourth Circuit has directed plainly that "whether the harassment was sufficiently severe or pervasive to create a hostile work environment is 'quintessentially a question of fact' for the jury [citation omitted] as is the issue of the plaintiff's credibility."  Conner v. Schrader-Bridgeport International, Inc., 227 F.3d 179, 199-200 (4th Cir. 2000).  And, the Court must consider the "totality of the circumstances."  Id. at 193.  Thus, the Court must consider "the cumulative [e]ffect of

---

[3] Salon Del Sol also claims that summary judgment must be denied on plaintiff's hostile work environment claim because it "has a legitimate, non-discriminatory reason for terminating Carroll" [ECF 29, at 18].  This, however, is the wrong standard.  The hostile work environment claim does not concern the termination of Carroll's employment. Similarly, when Salon Del Sol states that "to assess the merits of a Title VII retaliation claim. . ." in the middle of the argument concerning plaintiff's hostile work environment claim [ECF 29, at 15], it is applying the wrong standard.  Again, the hostile work environment claim is separate and apart from plaintiff's claim that she was wrongfully terminated.

individual acts." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002).  And, as stated, the harassment was carried out by her supervisor which makes it more threatening and severe than if the same actions were done by a co-worker.  Boyer-Liberto, 786 F.3d at 280.

The comments here are not "based on professional frustrations" as suggested by defendant [ECF 29, at 16].  In fact, the comments had nothing to do with work.  As stated previously, Spencer — the manager — though she was African-American and dated a Caucasian male, made it apparent that she did not "understand" relationships between white females and black males.  As Carroll explained at deposition, Spencer harassed her "because of my choice of racial -- my partner's race" (Ex. 1, at 98).[4]  And, as other employees offered, Carroll was "very professional" and "[i]t was disappointing to see the

---

[4] To be sure, while plaintiff has not alleged race discrimination, race discrimination also can involve treating someone unfavorably because the person is married to (or associated with) a person of a certain race or color. Nicol v. Imagematrix, Inc., 773 F. Supp. 802, 805 (E.D. Va. 1991) ("[C]ourts have consistently and sensibly recognized that discrimination on the basis of interracial marriage or association and discrimination on the basis of race are one and the same" (citations omitted)); Holcomb v. Iona College, 521 F.3d 130, 139 (2d Cir. 2008) (The reason is simple: where an employee is subjected to adverse action because an employer disapproves of interracial association, the employee suffers discrimination because of the employee's *own* race."); Deffenbaugh-Williams v. Wal-Mart Stores, Inc., 156 F.3d 581, 589 (5th Cir. 1998), *vacated in part on other grounds by* Deffenbaugh-Williams v. Wal-Mart Stores, Inc., 182 F.3d 333 (5th Cir. 1999) ("Title VII prohibits discrimination in employment premised on an interracial relationship."); Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick & GMC Trucks, Inc., 173 F.3d 988, 994-95 (6th Cir. 1999) (holding Title VII applicable to allegation that employee suffered discrimination because he had a biracial daughter); Parr v. Woodmen of the World Life Ins. Co., 791 F.2d 888, 892 (11th Cir. 1986) ("Where a plaintiff claims discrimination based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against because of *his* race."); EEOC COMPLIANCE   MANUAL,   Number   915.003,   Section   15 (https://www.eeoc.gov/policy/docs/race-color.html, last visited October 6, 2016).

way [] Spencer treated [] Carroll" (Ex. 5).[5]  Carroll should not have had to go to work and endure her manager's offensive racial comments, including comments disapproving of white women dating black men, suggestions that black men only like white women due to their curves, and comments that an African-American would not be hired for the front desk because she "would scare the white people." As one employee commented, the workforce at Salon Del Sol is "racially nondiverse"[6] despite Salon Del Sol's argument to the contrary (Exhibit 9, Bagby Dep., at 41; Exhibit 12).[7]

Continuing, despite defendant's argument to the contrary, comments do not have to be racial slurs to be actionable [ECF 29, at 16].  *E.g.*, Guessous v. Fairview Property Investments, LLC, 828 F.3d 208 (4th Cir. 2016) (calling for the totality of the circumstances to be considered and finding that the district court had erroneously

---

[5] In fact, no stylists suggested that Carroll was anything but easy to get along with (*E.g.*, Ex. 8, at 11).  On the flip side, multiple stylists suggested that Spencer "was not the best manager" (Ex. 4; Ex. 5; Ex. 8, at 8).

[6] Not surprisingly, Salon Del Sol has been accused of having improper hiring practices, as well (Ex. 19, at 15).

[7] Notably, discrimination can occur when the victim and the person who inflicted the discrimination are the same race or color.  Ross v. Douglas County, 234 F.3d 391, 393 & 395-97 (8th Cir. 2000) (affirming verdict in favor of Black employee whose Black supervisor subjected him to racially derogatory slurs, such as the "N-word" and "black boy," and referred to the employee's wife, who was White, as "whitey": "Such comments were demeaning to Ross. They could have been made to please Johnson's white superior or they may have been intended to create a negative and distressing environment for Ross. Whatever the motive, we deem such conduct discriminatory."); Kang v. U. Lim America, 296 F.3d 810, 817 (9th Cir. 2002) (hostile work environment could be found where Korean supervisor with stereotypical beliefs about the superiority of Korean workers held Korean Plaintiff to higher standards, required him to work harder for longer hours, and subjected Plaintiff to verbal and physical abuse when he failed to live up to supervisor's expectations); Santiago v. Stryker Corp., 10 F. Supp. 2d 93, 96 (D.P.R. 1998) (holding dark-complexioned Puerto Rican citizen replaced by light-complexioned Puerto Rican citizen could establish a *prima facie* case of "color" discrimination); United States v. Crosby, 59 F.3d 1133, 1135 n. 4 (11th Cir.1995) (noting that a Title VII violation may occur even where a supervisor is the same race as the alleged victim); EEOC COMPLIANCE MANUAL, Number 915.003, Section 15 (https://www.eeoc.gov/policy/docs/race-color.html, last visited October 6, 2016).

discounted comments as not being race or national origin based). Moreover, it is disingenuous to refer to these remarks as "friendly conversations" as defendant suggests [ECF 29, at 16]. Significantly, one employee, Whitney Wohlford, witnessed Carroll upset by these comments (Ex. 4). Another employee, Lauren Sacra, also discussed Spencer's comments with Carroll and observed that Carroll was upset by the comments (Ex. 5). And, Carroll's African-American boyfriend observed that she was upset by these comments (Ex. 3, at 9). Moreover, Carroll specifically told Vetsch that the comments were "disgusting" "disturbing" and "absurd" and that she was "appalled" and took "serious offense" to the comments and that she could no longer work for someone who acts on "prejudice" (Ex. 7; *see also* Ex. 1, at 80 "if Shawn's racial -- inability to control her racial comment didn't change and if the -- like the unhealthy work environment from a manger that I felt was disrespectful and made inappropriate comments, if that didn't change, then I couldn't stay there under those circumstances"). Significantly, it is not necessary that the plaintiff suffer a nervous breakdown before the harassment becomes actionable under federal law:

> But Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers.

Harris v. Forklift Sys., Inc., 126 L. Ed. 2d 295, 302 (1993).[8]

---

[8] And, the harassment here certainly discouraged Carroll from remaining on the job and advancing in her career. Salon Del Sol was an AVEDA salon, and at the time of Carroll's termination it was the only AVEDA salon in the area (Ex. 1, at 104). Carroll loved working with AVEDA and Carroll's plan was to continue with Salon Del Sol and AVEDA and to become an AVEDA educator (Id. at 103). Carroll in fact gave "up [her][] two full-time years of radiography to continue [her][] pursuit in the hair industry because

Finally, Salon Del Sol frequently refers to Spencer's version of the comments that she made. This, however, is improper at summary judgment. Plaintiff will not recite her evidence again, but it is clear that plaintiff is not alleging that "she voluntarily engaged in two (2) casual conversations about a topic in which both women shared an interest: inter-racial dating, and then overheard one offhand comment about a job applicant's accessories" [ECF 29, at 17]. And, here, while it does not matter for summary judgment purposes, it is likely that a jury will believe plaintiff given that Kari Babgy, the other individual that Spencer claimed was part of her version of events, denies that she was involved (despite still being employed by Salon Del Sol) (Ex. 9, at 16; Exhibit 10); and, as one employee offered at deposition, Spencer is "good at spinning the truth" (Ex. 8, at 10). Notably, Spencer tried to further deflect blame here by suggesting that it was others who made racial comments (Exhibit 11, Spencer Dep., at 77-84), and specifically alleged that one white employee was discriminatory against whites (Ex. 11, at 90).

In conclusion, Salon Del Sol has asserted only that there is not a question of fact with respect to element 3, the severe or pervasive prong, of the hostile work environment claim. For the foregoing reasons, and as this prong presents a quintessential question of fact for the jury, summary judgment must be denied.

## B.  Retaliation

The Supreme Court has vigorously protected an employee's right to be free from retaliation. Specifically, the Court has consistently construed the antiretaliation provision broadly, explaining that it must extend beyond the discrimination provision to ensure employees the full protection of Title VII. *See, e.g.*, <u>Crawford v. Metro. Gov't of</u>

---

of Salon del Sol and Aveda" (<u>Id.</u> at 85-86). Moreover, leaving Salon Del Sol meant Carroll had to rebuild her clientele again — in essence, starting from scratch (<u>Id.</u> at 104).

<u>Nashville & Davidson Cnty., Tenn.</u>, 555 U.S. 271 (2009); <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 67 (2006) ("Interpreting the antiretaliation provision to provide broad protection from retaliation helps ensure the cooperation upon which accomplishment of the Act's primary objective depends."). Thus, the Supreme Court has interpreted the protections of the antiretaliation provision to cover "a broad range of employer conduct." <u>Thompson v. N. Am. Stainless, LP</u>, 131 S. Ct. 863, 868, 870 (2011) (citing <u>Burlington N.</u>, 548 U.S. at 62, 64, 68) (applying the protections of the antiretaliation provision to third parties who are in the zone of interests that Title VII seeks to protect)).

As set forth *infra*, here Carroll has set forth a *prima facie* case of retaliation pursuant to the familiar <u>McDonnell Douglas</u> burden-shifting approach, as, at a minimum, a question of fact exists as to 1) whether Carroll engaged in protected activity, and defendant admits that Carroll has set forth a *prima facie* case with respect to 2) whether an adverse employment action was taken against Carroll, and 3) whether there is a causal link between the protected activity and the adverse employment action. <u>Laughlin v. Metro Washington Airports Auth.</u>, 149 F.3d 253, 258 (4th Cir. 1998) (citing <u>Hopkins v. Baltimore Gas & Elec. Co.</u>, 77 F.3d 745, 754 (4th Cir. 1996)). As this Court is aware, "[t]he burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." <u>Mickey v. Zeidler Tool and Die Co.</u>, 516 F.3d 516, 526 (quoting <u>Nguyen v. City of Cleveland</u>, 229 F.3d 559, 563 (6th Cir. 2000); *see also* <u>Dixon v. Gonzales</u>, 481 F.3d 324, 333 (6th Cir. 2007) ("The burden of proof at the *prima facie* stage is minimal").

a. **A jury may easily find that Carroll engaged in oppositional protected activity — in fact Carroll is entitled to summary judgment with respect to this issue.**

With respect to the *prima facie* case, defendant alleges only that Carroll did not engage in protected activity, and specifically, that she did not engage in protected activity because she did not have a reasonable belief that what she was complaining about was in violation of federal law [ECF 29, at 19-20]. Defendant is mistaken.

Despite defendant's argument to the contrary, the facts underlying plaintiff's complaint need not rise to the level of a hostile work environment for plaintiff's complaint to be protected oppositional activity. Crews v. Ennis, Inc., 2012 U.S. Dist. LEXIS 167697, at *18 (W.D. Va. Nov. 27, 2012) ("A plaintiff may succeed on a retaliation action even if the underlying activity does not rise to the level of discrimination" (citing Ross v. Comm. Satellite Corp., 759 F. 2d 355, 357 n.1 (4th Cir. 1985) ("An underlying discrimination charge need not be meritorious for a plaintiff to prevail on a claim of retaliation for opposition to perceived discrimination."))); Cuffee v. Tidewater Cmty. College, 409 F. Supp. 2d 709, 720 (E.D. Va. 2006) ("To satisfy the protected activity element then, a plaintiff need not show that unlawful employment practice was actually occurring but must merely show that she had a good faith, reasonable belief that such activity was occurring") (citing Freilich v. Upper Chesapeake Health, Inc., 313 F.3d 205, 216 (4th Cir. 2002))); *EEOC Enforcement Guidance on Retaliation and Related Issues*, Notice 915.004, at pages 14-18 (https://www.eeoc.gov/laws/guidance/retaliation-guidance.cfm, last visited October 6,

2016).[9]  As is clear, this makes sense.  For example, as was the case in <u>Boyer-Liberto</u>, it would be illogical for an employee who has been called a "porch monkey" to say to themselves, I'll wait till I've been called porch monkey 5 times before I complain. Moreover, terminating an employee for making a complaint cuts directly against Title VII's desire to prevent racial harassment and its related grant of protection to employers under the <u>Faragher</u>/<u>Ellerth</u> affirmative defense for employers who take action to remedy and prevent harassment.

Here, Carroll clearly had a good faith belief that Spencer was violating Title VII and her belief was reasonable in light of the facts.  <u>Whittaker v. David's Beautiful People, Inc.</u>, 2016 WL 429963 (D. Md. Feb. 4, 2016) is instructive.  There, the plaintiff showed the owner of the salon two offensive text messages from a co-worker.  The court found that while the text messages did not rise to the level of a hostile work environment (or at least not yet), the plaintiff's complaint concerning the messages nevertheless was protected activity.  As the court in <u>Whittaker</u> pointed out, "[t]he Fourth Circuit has held 'that an employee's complaint constitutes protected activity when the employer understood, or should have understood, that the plaintiff was opposing discriminatory conduct.'"  <u>Whittaker</u>, 2016 WL 429963 at *19 (quoting <u>Burgess v. Bowen</u>, 466 F.App'x 272, 282 (4th Cir. 2012) (citing, *inter alia*, EEOC Compliance Manual § 8-II.B.2 (2006) ("[A] protest is protected opposition if the complaint would reasonably have been interpreted as opposition to employment discrimination.")); citing <u>Strothers v. City of Laurel, Md.</u>, No. PWG-14-3594, 118 F. Supp. 3d 852, 2015 U.S. Dist. LEXIS 97974, 2015 WL 4578051, at *10 (D.Md. July 27, 2015) (denying a motion to dismiss a

---

[9] The EEOC's interpretation of Title VII is to be accorded "great deference." <u>Griggs v. Duke Power Co.</u>, 401 U.S. 424, 434, 91 S. Ct. 849, 855, 28 L. Ed. 2d 158, 165 (1971).

retaliation claim because the plaintiff complained about "harassment," which was sufficient to put employer on notice that she was complaining about discrimination)); *see also* Sias v. City Demonstration Agency, 588 F.3d 692, 695 (9th Cir. 1978) (citing Pettway v. Am. Cast Iron Pipe Co., 411 F.2d 998, 1004-1007 (5th Cir. 1969)); Johnson v Univ. of Cincinnati, 215 F.3d 561, 582 (6th Cir. 2000).  As the court continued,

> Moreover, the Fourth Circuit has expanded the scope of what constitutes a protected activity. *See, e.g.*, DeMasters v. Carilion Clinic, 796 F.3d 409, 416-21 (4th Cir. 2015); Boyer-Liberto, 786 F.3d at 285-88. As Judge Grimm noted recently, this "broad[er] reading of Title VII extends its protection to an employee who reasonably fears that she is being subjected to unfavorable treatment based on her [protected status], even where, as here, that treatment does not rise to the level of creating a hostile work environment." Young, 108 F.Supp.3d at 316. The court in Young found that the plaintiff's protest was a protected activity even though she did not plead a plausible hostile work environment claim. Id. at 316-17. Her protests were a protected activity because she had a reasonable belief that the workplace activity was a violation of Title VII and clearly indicated that she was complaining about gender discrimination rather than general workplace grievances. *See* id. Similarly, here, Plaintiff has sufficiently shown that she engaged in a protected activity even if the underlying conduct about which she complained did not create (or had not yet created) a hostile work environment.

Id. at *20-21.  The same holds true here. Carroll specifically reported the racial comments and stated that she could not work in a prejudicial environment (Exhibit 13). Summary judgment for defendant must therefore be denied.

### b.  **Defendant admits that Carroll was terminated for complaining.**

Because Carroll has made a *prima facie* showing of retaliation, the burden of production shifts to Salon Del Sol to demonstrate a legitimate, non-discriminatory reason for its action.  Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (*en banc*).  Salon Del Sol argues that it had a legitimate reason to terminate Carroll for "insubordination and negative attitude toward management and Company policies"

[ECF 29, at 20].  Salon Del Sol admits, though, that what it thought was insubordinate was Carroll's complaint (Ex. 11, at 69, "because of her e-mail she was fired").  This, therefore, is an admission of liability — not a legitimate, non-discriminatory justification for the termination.  Therefore, summary judgment must be denied.

Thus, while it is unnecessary to go to the pretext stage, it is obvious that there is a question of fact for a jury to determine whether plaintiff's complaints concerning racial harassment were a "but-for" cause of her termination.

As an initial matter, Salon Del Sol has set forth the wrong legal standard yet again.  The courts have been clear that "but-for" does not mean "solely" as defendant suggests [ECF 29, at 21].  *E.g.*, EEOC v. City of Greensboro, 2010 U.S. Dist. LEXIS 132159, at *33-35 (M.D.N.C. Dec. 14, 2010); Miller v. Am. Airlines, Inc., 525 F.3d 520, 523 (7th Cir. 2008) ("The plaintiffs do not have to show, however, that their age was the sole motivation for the employer's decision; it is sufficient if age was a 'determining factor' or a 'but for' element in the decision.").  The question is whether Carroll's protected activity was *a* but-for cause of the alleged adverse action, not *the* but-for cause.  As the Supreme Court stated in Burrage v. United States, 134 S. Ct. 881, 888-89, 187 L. Ed. 2d 715 (2014), but-for causation does *not* require a showing that an impermissible motive was the *sole cause* of the challenged action.  In Burrage, the Supreme Court clarified that a claim of retaliation "require[s] proof that the desire to retaliate was [*a*] but-for cause of the challenged employment action."  Burrage, 134 S. Ct. at 888-89 (quoting University of Tex. Southwestern Medical Center v. Nassar, 133 S.Ct. 2517, 186 L. Ed. 2d 503 at 514 (2013)) [Alteration in original] [Emphasis added].  As the Court explained:

14

> Thus, "where A shoots B, who is hit and dies, we can say that A [actually] caused B's death, since but for A's conduct B would not have died." LaFave 467-468 (italics omitted). The same conclusion follows if the predicate act combines with other factors to produce the result, so long as the other factors alone would not have done so-if, so to speak, it was the straw that broke the camel's back. Thus, if poison is administered to a man debilitated by multiple diseases, it is a but-for cause of his death even if those diseases played a part in his demise, so long as, without the incremental effect of the poison, he would have lived. *See, e.g.*, State v. Frazier, 339 Mo. 966, 974-975, 98 S.W. 2d 707, 712-713 (1936).

Burrage, 134 S. Ct. at at 888. Thus, as Judge Quarles for the United States District Court for the District of Maryland in Taylor v. Rite Aid Corp., 993 F. Supp. 2d 551 (D. Md. 2014) explained in denying summary judgment in part on a Title VII and ADA discrimination and retaliation case, University of Texas Southwest Medical Center v. Nassar, 133 S. Ct. 2517 (2013) does *not* require that the protected conduct be the "only" factor for the termination:

> Nassar requires a plaintiff asserting a retaliation claim to show that her "protected activity was *a* but-for cause of the" employer's adverse action. Nassar, 133 S. Ct. at 2534 [emphasis added in Taylor]. Nassar does not require that protected activity be the *only* factor that resulted in an adverse action, just that the adverse action would not have occurred without the protected activity. *See* Nassar, 133 S. Ct. at 2533 ("Title VII requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."). Accordingly, Taylor's performance problems alone, even if they motivated the decision to terminate her in part, do not foreclose a retaliation claim under Nassar.

Taylor, 993 F. Supp. 2d at 567.

This Court, therefore, cannot make a determination as a matter of law that the fact that Carroll complained of racial harassment was not the straw that broke the camel's back when Salon Del Sol *admits* that it terminated Carroll for the very email that includes those complaints (*see also, e.g.*, Ex. 19, at 41, 53, acknowledging that the email was the "final situation" and that the racial aspect was "part of the problem"). Doing so would

15

invade the province of the jury to make factual determinations. And, courts have repeatedly emphasized that an employer's reliance on subjective criteria to terminate an employee should be closely scrutinized and thus a jury must assess the credibility of the witnesses with respect to this issue. *See, e.g.*, McClain v. Lufkin Inds., 519 F.3d 264, 276-77 (5th Cir. 2008) (employer's manipulation of objective measures, such as attendance, ability determinations, training opportunities, promotions to salaried positions, and discipline records, constituted subjective criteria); McCullough v. Real Foods, Inc., 140 F.3d 1123 (8th Cir. 1998) (employer's reliance on subjective criteria for failing to promotion African-American plaintiff was suspect where plaintiff was objectively more qualified than person who received promotion); Greaser v. Missouri Dep't. of Corr., 145 F.3d 979, 983 (8th Cir. 1998) (employer's contention that employee "did not interview well" was subject to close scrutiny by jury; where jury believed employer witnesses over plaintiff, verdict was proper); Bruhwiler v. University of Tenn., 859 F.2d 419, 421 (6th Cir. 1998) (employer's proffered reason for denying promotion to female employee was subject to "particularly close scrutiny" where an evaluation of plaintiff's qualifications was subjective and evaluators were not members of protected group); Jauregui v. City of Glendale, 857 F.2d 1128, 1135 (9th Cir. 1998) (cautioning that "subjective practices are particularly susceptible to discriminatory abuse and should be closely scrutinized"); Crawford v. Western Elec. Co., 745 F.2d 1373, 1384 (11th Cir. 1984) (employer's index review system, which allowed supervisors to make wholly subjective evaluations of employees without simultaneously documenting their results, permitted too much discretion and failed to rebut plaintiff's *prima facie* case"); Casillas v. United States Navy, 735 F.2d 338, 345 (9th Cir. 1984) (stating that "[a]n employer's

use of subjective criteria is to be considered by the trial court with the other facts and circumstances of the case"); <u>Carroll v. Sears, Roebuck & Co.</u>, 708 F.2d 183, 192 (5th Cir. 1983) (predominantly subjective … promotional practices … warrant strict scrutiny by this Court"); <u>Paxton v. Union Nat'l Bank</u>, 688 F.2d at 563 & n.15 (finding discrimination where subjective criteria were used to fill first- and middle-level supervisory positions and noting that "[p]romotional procedures wherein white supervisors make the promotional decisions on the basis of largely subjective criteria must be closely scrutinized because of their susceptibility to discriminatory abuse"); <u>Payne v. Travenol Labs.</u>, 673 F.2d 798 (5th Cir. 1982) (evidence supported finding of supervisor's recommendation, which was major factor in promotions, was delivered without guidance by any objective standards); <u>Turner v. Honeywell Fed. Mfg. & Techs., LLC</u>, 336 F.3d 716, 721 (8th Cir. 2003) ("a plaintiff alleging a *prime facie* case of failure to promote should not bear the same burden when the criteria are subjective and the process 'vague and secretive' as when the case involves 'objective hiring criteria' applied to all applicants") (citing <u>Thomas v. Denny's, Inc.</u>, 111 F.3d 1506, 1510 (10th Cir. 1997)); <u>Hemmings v. Tidymann's Inc.</u>, 285 F.3d 1174, 1187 n.17 (9th Cir. 2002) (stating that "failure to post vacancies and the use of subjective promotion practices … may be evidence of discrimination"); <u>Jauregui</u>, 852 F.2d at 1135 (pretext found when employer asserted lack of interpersonal skills by plaintiff; deficiency not noted in previous employment evaluations); <u>Bergene v. Salt River Project Agric., Improvement & Power Dist.</u>, 272 F.3d 1136, 1142 (9th Cir. 2001) ("[a]gainst the backdrop of the other evidence of pretext, the subjective nature of [the] criteria provides further circumstantial evidence that [defendant] denied [plaintiff] the promotion as a form of retaliation").

Continuing, "at the summary judgment stage, a plaintiff need only present enough evidence of pretext that a reasonable jury could find in her favor." Williams v. G4S Secure Solutions (USA), Inc., 2012 U.S. Dist. LEXIS 66249, at *44-45 (D. Md. May 11, 2012) (citing, *e.g.*, Okoli v. City Of Baltimore, 648 F.3d 216, 228 (4th Cir. 2011) ("[B]ecause a jury could credit [plaintiff's] evidence indicating that [his employer's] proffered reasons were pretextual, … it should be for the jury to determine whether the … nondiscriminatory reasons were the true motivation for [plaintiff's] termination."); Wesley v. Arlington Cnty., 354 F. App'x 775, 782 n.9 (4th Cir. 2009) ("[W]e must … not invade the province of the jury and weigh the credibility of witnesses and evidence on contested issues of fact. We make no ultimate judgment on whether the reasons offered by the [employer] are pretextual. Instead, reviewing the limited and contradictory evidence in the record in the light most favorable to [plaintiff], we only hold that a reasonable jury could reach such a conclusion."); Lettieri v. Equant Inc., 478 F.3d 640, 649 (4th Cir. 2007) ("To this point, [plaintiff] has made out a *prima facie* case . . . and offered ample evidence to discredit [his employer's] proffered nondiscriminatory reason for her termination. Because [his employer] has not offered 'uncontroverted independent evidence that no discrimination [ ] occurred,' [plaintiff's] showing is sufficient to permit a 'trier of fact to infer the ultimate fact of [intentional] discrimination from the falsity of the employer's explanation'" (quoting Reeves, 530 U.S. at 147-48 (some alterations in Lettieri))).   As stated, while it is unnecessary for the Court to consider pretext as Salon Del Sol has admitted it terminated Carroll for the email, here, Salon Del Sol's justification that it did not have an issue with Carroll's complaint in the

email concerning racial harassment but only the other parts of her email concerning Spencer's inability to manage, reeks of pretext.

Per Carroll's testimony, the purpose of the email was to voice her "concerns about Shawn's attitude and *racial remarks*" (Ex. 1, at 73) [Emphasis added]. As Carroll stated, she complained because the environment was such that she could not continue to work at the salon if Spencer was permitted to make offensive racial remarks (Id. at 80). Vetsch responded that Spencer was doing well for the company and thus she did not plan on Spencer leaving the company — notably Vetsch came to this conclusion without any investigation into what happened, and as she testified, she "[n]ever" visits the Roanoke location (Id. at 81; *see also* Ex. 18, at 27, 41-42). Vetsch continued that Carroll could not provide good services to guests if she is unhappy with her manager's racial comments (Ex. 1, at 84-85). Thus, Vetsch's response was to terminate the victim rather than the harasser making the comments (Ex. 18, at 45). Of course, terminating the harasser, Spencer, would have also solved the problem. Notably, Salon Del Sol cannot "weed []️ out" workers that are "unhappy" because they are being harassed (Ex. 19, at 42). And, with respect to the content of Carroll's complaint, Carroll never issued an ultimatum as Salon Del Sol suggests [ECF 29, at 20] — unless Salon Del Sol is referring to Carroll stating that she could no longer emotionally endure working in an environment with repeated racial comments by her supervisor. Moreover, it is irrelevant whether Vetsch "did not think much of Carroll's race-based claims" [ECF 29, at 20], because any employer who receives a complaint that their manager is refusing to hire African-American employees on the basis of being "ghetto" and that same manager tells employees engaged in relationships with African-American men that she does not

understand white women dating black men and commenting that black men like white women because of their curves has a duty to investigate; and, ignorance of the law — i.e., stating that "she did not find the referenced comments to be racially hostile or harassing" [ECF 29, at 20], is no excuse. Vetsch was not empowered to terminate Carroll's employment for making complaints about racial comments regardless of what she felt about the merit of them — especially when no investigation occurred.[10]

> As is clear, this termination had a grave effect on Carroll,
>
> A. Well, after -- it was quite devastating to me to be terminated for, you know, voicing a concern. I had anxiety problems and trouble sleeping and being upset and periods of frustration and irritability because of the stress of the situation. It's absolutely embarrassing to be terminated from a job that you devote yourself to and humiliating, and it really shot down my confidence as a Page 106 hair stylist and as an employee. I felt like my worth was less because of how they treated me[.]

(Ex. 1, at 105-106). As Carroll's boyfriend confirmed,

> Q. And how else did she respond to the termination? What did she do in response?
> A. She was highly upset because she was terminated for trying to -- from my understanding, she was just trying to address an issue, wasn't trying to even cause a problem, just wanted to actually address the issue so it didn't keep happening, because it was upsetting her so much at times at home. And she was terminated for that, so she was definitely upset.

(Ex. 3, at 12).

---

[10] Vetsch might have concluded that the comments were not racially hostile or harassing because she herself does not understand racial harassment or an employer's duty to prevent and correct racially harassing behavior,

> Q. Does Salon Del Sol do racial harassment and discrimination training for its employees?
> A. No, sir.
> Q. What is the company's policy concerning discrimination or harassment on the basis of race?
> A. I don't understand the question.

(Ex. 18, at 28; *see also* id. at 30). Similarly, operations manager Steve Storer testified that despite the fact that he handles some HR duties at Salon Del Sol, he has no professional training in HR and is not a member of SHRM (Ex. 19, at 9).

And, as Carroll informed Vetsch by email (Ex. 12), voicing concerns is not the equivalent of being unhappy and disgruntled.  As Carroll stated at deposition,

> Q. Okay. So first she says, "You're severely disgruntled and unhappy with your employment." That's a true statement, isn't it?
> A. No.
> Q. You weren't unhappy?
> A. No.
> Q. You weren't unhappy with your management?
> A. I was not severely disgruntled and unhappy with my employment at Salon del Sol.
> Q. Hadn't you just sent an email complaining about your management?
> A. I was unhappy with my manager and the way she managed the salon and the racial and offensive comments that she made to me and other coworkers and her attitude. I actually sent an email in January of 24 2013 telling Denise how happy I was to work for her company and how much I wanted to go back into doing hair and was giving up my two full-time years of radiography to continue my pursuit in the hair industry because of Salon del Sol and Aveda. So I think that's quite the opposite of severely unhappy and disgruntled.
> Q. Were you unhappy with your management at the time?
> A. I was unhappy with Shawn. I was not unhappy with Denise. I was not unhappy with Bob. I was not unhappy with Martha. I was unhappy with Shawn.
> Q. And so you responded to that email from Denise the same day, and this is pages 1 and 2 of this Exhibit 12, Carroll 283 and 284, and in your response you copied the whole salon; is that correct?
> A. Yes.
> Q. Why did you do that?
> A. Because I know that if I didn't want my name and me bashed, and, you know, a lie basically about why I didn't work there anymore, I had the -- I needed to let everyone know exactly what happened. And since I was terminated in the previous email, I had no requirement or any kind of need to keep that confidential between me and Shawn and Denise anymore.
> Q. And you start out by saying, "If you think that by me frankly voicing my concerns to you means that I am unhappy and disgruntled then, you are absolutely right, this is not a company I should be working for."
> A. Yes.
> Q. And you meant that?
> A. If she thinks that, then that's -- yes. I meant that if she feels that me voicing my concerns caused me to be unhappy and disgruntled, then that is not a company that I should be working for because *that shows me that it is not an open door policy and that I'm not able to go to my superiors and voice my concerns.*
> Q. You say that she didn't look into the issues or investigate. Do you

21

know that she didn't investigate?
A. From what she said in the emails, she gave me not evidence that she investigated. She didn't tell me that she looked into the issues, and she said that we needed to meet face-to-face to discuss these further. So that told me that she did no investigation or look into any of the issues.

(Ex. 1, at 85-87) [Emphasis added].  Moreover, sending a private email to complain about the harassment and hostile work environment to your supervisor and the next level of supervision above the harasser, the owner, is by no means "disruptive."[11]  In fact, much more disruptive practices have been held to have been acceptable.  *E.g.*, Scarbrough v. Bd. of Trs. Fla. A&M Univ., 504 F.3d 1220, 1222 (11th Cir. 2007) ("Although involving the police in an employment dispute will not always be considered part of the protected conduct that prohibits retaliatory action, where, as here, it allegedly derived from an effort to protect against actions that are intertwined and interrelated with alleged sexual harassment, it cannot be deemed the 'unprofessional' conduct for which an employee can be terminated."); EEOC v. Crown Zellerbach Corp., 720 F.2d 1008, 1014 (9th Cir. 1983) (observing that all actions of opposition to an employer's practices constitute some level of disloyalty, and therefore in order to reach the level of being unreasonable, such opposition must "significantly disrupt[] the workplace" or "directly hinder[]" the plaintiff's ability to perform his or her job); EEOC v. Kidney Replacement Servs.,No. 06-13351, 2007 WL 1218770, at *4-6 (E.D. Mich. 2007) (concluding that medical workers engaged in reasonable opposition when they raised their sexual harassment complaints directly to the onsite supervisor at the correctional facility to which their employer had assigned them, even though they were in effect raising a complaint to their employer's

---

[11] And to the extent Salon Del Sol argues it was disruptive to send the email to the other staff, this was not done until Carroll's employment was already terminated and thus this could not have played a role in the decision to terminate her employment.

customer); Payne v. McLemore's Wholesale & Retail Stores, 654 F.2d 1130, 1136 (5th Cir. 1981) (holding that picketing in opposition to employer's alleged unlawful practice was protected activity under Title VII even though employer's business suffered); EEOC Dec. 71-1804, 3 FEP 955 (1971) (holding that right to strike over unlawful discrimination cannot be bargained away in union contract); Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990); EEOC v. Crown Zellerbach Corp., 720 F.2d 1008, 1013-1014 (9th Cir. 1983) (holding that employer violated Title VII when it imposed disciplinary suspension in retaliation for public protest letter by several employees of an "affirmative action award" given to a major customer; reasoning that even though the letter could potentially harm the employer's economic interests, it was a reasonable manner of opposition because it did not interfere with job performance); Matima v. Celli, 228 F.3d 68, 78-79 (2d Cir. 2000) (collecting cases).

As more evidence of pretext, Salon Del Sol also shredded documents related to this case (Exhibit 14).[12]  Carroll is therefore entitled to a spoliation inference.  Goodman v. Praxair Servs., 632 F. Supp. 2d 494, 519-20 (D. Md. 2009).  Notably, Salon Del Sol told the EEOC that the file was shredded at the beginning of the year because Salon Del Sol only keeps files for a year, yet Carroll was terminated on June 17, 2013 (Ex. 13) and Salon Del Sol answered the EEOC Charge of discrimination on January 22, 2014 — only 6 months later (Ex. 12).  Thus, Salon Del Sol clearly knew within the year period that it needed to keep Carroll's file, yet it shredded it anyways.

And, as more evidence of pretext, Spencer claims that she did not read Carroll's email until weeks later (Ex. 11, at 73-74).  Yet, she responded the very next day "OMG!

---

[12] Despite Storer telling the EEOC that Salon Del Sol keeps files for 1 year, Storer testified that the files are kept for 7 years (Ex. 19, at 35).

Can I fire her?!?!?" (Exhibit 15).  As Wohlford and Sacra stated, the reality is that Spencer did not like anyone who stood up to her (Ex. 4; Ex. 5).[13]  And, as Carroll testified, Vetsch was concerned about keeping Spencer, not Caroll's racial complaints (Ex. 1, at 33-34).

Similarly, Salon Del Sol has continued to distort its reason for terminating Carroll, claiming to the EEOC that Carroll was terminated "on the basis that she was causing a disruption" (Exhibit 16) — yet every witness confirmed that Carroll was easy to get along with and did not cause a disruption in the workplace.  And, Salon Del Sol further stated to the EEOC that "Ms. Carroll's response to her termination was typical of her in that fact that she begins to talk negatively about the company and ownership" (Id.). Yet, again, this was denied by the employees and Spencer even confirmed that Carroll was loved by her guests "and they would all rave about her" (Ex. 11, at 66, 122).  As the Supreme Court has explained, "[p]roof that the defendant's explanation is unworthy of credence is [] one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." Reeves, 530 U.S. at 147.

In sum, at trial, the jury will likely find, as did the EEOC, that "[t]he evidence supports [Carroll's] claim that she was retaliated against in violation of Title VII for engaging in protected activity" (Ex. 19, at 29).  Summary judgment must therefore be denied.

## CONCLUSION

In summary, material questions of fact preclude summary judgment.  Plaintiff therefore requests entry of an order denying defendant's motion for summary judgment.

---

[13] Tellingly, Spencer previously told all the staff not to go to Corporate with complaints (Exhibit 17).

Respectfully submitted,

SARAH CARROLL

By_____/s/ *Terry N. Grimes*_____
　　　　　Of Counsel

Terry N. Grimes, Esquire (VSB #24127)
Brittany M. Haddox, Esquire (VSB #86416)
TERRY N. GRIMES, ESQ., P.C.
320 Elm Avenue, S.W.
Roanoke, Virginia 24016
TELEPHONE:  (540) 982-3711
FACSIMILE:  (540) 345-6572
tgrimes@terryngrimes.com
bhaddox@terryngrimes.com
Of Counsel for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was

electronically filed with the Clerk of the Court using the CM/ECF system, which will send

notification to all counsel of record, this 14th day of October, 2016.

　　　　　　　　　　　　　*Terry N. Grimes*_____
　　　　　　　　　　　　　Terry N. Grimes